## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ROBIN MENDOZA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 09 C 5037 |
| v. | ) | |
| | ) | Magistrate Judge |
| MICHAEL J. ASTRUE, | ) | Maria Valdez |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying plaintiff Robin Mendoza's claim for Disability Benefits and Supplemental Security Income Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Mendoza's motion for summary judgment [Doc. No. 19] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings.

## BACKGROUND

### I.  PROCEDURAL HISTORY

Mendoza originally filed a Title II application for a period of disability and disability benefits on April 27, 2006. (R. 13.) On the same day, Mendoza also filed a Title XVI application for supplemental security income. (*Id.*) Both applications were premised on a disability beginning in December of 2005. (*Id.*) Both of Plaintiff's claims were denied initially on July 31, 2006, and were later denied upon reconsideration on November 9, 2006. (*Id.*) Mendoza timely filed a written request for a hearing by an Administrative Law Judge ("ALJ") on January 4, 2007, and the hearing was held on May 13, 2008. Mendoza personally appeared and testified at the hearing and was represented by counsel. (*Id.*) An impartial vocational expert, Grace Gianforte, also appeared at the hearing. (*Id.*)

On December 15, 2008, the ALJ denied Mendoza's claims and found Mendoza not disabled under the Social Security Act. (R. 23.) The Social Security Administration Appeals Council denied Mendoza's request for review on June 12, 2009. (R. 1.) The ALJ's decision thus became reviewable by the District Court under 42 U.S.C. § 405(g), *see Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005), and Mendoza filed this timely complaint for judicial review.

## II. FACTUAL BACKGROUND

### A. <u>Background</u>

Mendoza was born on September 26, 1973 and was thirty-two years old on December 16, 2005, the date on or around which she claims her disability began. (R. 66.) Plaintiff claims that a work injury caused her disability; she explains that she was shoveling snow off of a school roof for almost two weeks and experienced "basically a burnout of all [her] muscles." (R. 37.) The specific impairments Mendoza alleges include: chronic myofascial pain, bilateral carpal tunnel syndrome, bilateral epichondylitis, medial epichondylitis, fibromyalgia and depression. (R. 28-29, 34.) Before the accident, Plaintiff worked as a construction laborer. (R. 32.) Before that, she worked as a radiation worker, bus driver, a receptionist, a machine operator, a parts inspector, and an Avon salesperson. (R. 32-33, 55-56.)

### B. <u>Testimony and Medical Evidence</u>

#### 1. *Mendoza's Testimony*

Mendoza's main symptoms are chronic pain and depression. (R. 28.) Her pain is everywhere, "in all her muscles," and is exacerbated by any activity. (R. 33-34, 44.) She explains that she must "calculate" everything she does: "if I want to go somewhere, you know, I have to psychologically, you know, tell myself, you know, you got to walk slow, don't walk too fast, don't lift this, don't lift that because the following day, whatever muscles I use flare up and become very painful." (R. 45.) Lifting and walking are difficult, and she cannot walk or stand five minutes an hour over the course of a day without experiencing painful flare-ups. (R. 46-47.) She has

to sit with her neck back and her head rested on something. (R. 51.) Essentially, any movement causes an increase in pain. (R. 48-49.) She could not finish an online class because her arms, elbows and hands began to cramp, and eventually she could not even read or concentrate. (R. 50.) She is unable to do any household chores without experiencing painful muscle spasms. (R. 41.) She is easily fatigued, and sometimes sleeps all day due to her exhaustion. (R. 39.) Plaintiff also complains that her pain and depression are interrelated, and explains that her chronic pain and resulting limitations exacerbate her depressed psychological state. (R. 52-53.)

Mendoza has taken Flexeril, Neurontin, Naproxen, Ultracet, Zanaflex, Cymbalta, Lamictal, Lorazepam, Temazepam, Methylphenidate, Provigil, Seroquel, and Sonata for pain, depression and insomnia. (R. 11, 244.) She has also received numerous epidural and trigger point botox injections, as well as steroid / local anesthetic injections for temporary pain relief, and has used a Fentanyl patch and a Flector patch. (R. 50-51, 37.) Prescription medications, however, sometimes did not work and/or gave Mendoza various side effects, including dopiness, drowsiness, shakiness, memory loss, decreased attention span, and limited concentration abilities. (R. 37-38, 244.)

### 2. *Medical Evidence*

#### a. **Treating Physicians**

On December 16, 2005, Mendoza saw Dr. Asavari Javeri and complained of tingling, numbness and dull pain in both of her upper extremities. (R. 747.) Dr. Javeri noted that there was paraspinal tenderness on both of Plaintiff's sides, and

4

some stiffness in the paraspinal muscles. (*Id.*) He also reported mild cervical tenderness, and that upper extremity strength, sensation and reflexes were normal, and that shoulder range of motion, and shoulder, elbow and wrist exams were normal. (*Id.*) Dr. Javeri suggested several days off of work, a Magnetic Resonance Imaging ("MRI") exam, and a prescription for Naproxen. (*Id.*)

A week after she suffered her work-related injury, Mendoza was diagnosed by Dr. Louis Papaeliou of the Joliet Medical Group with a peripheral neuropathy of questionable source. (R. 657.) Plaintiff's MRI of the cervical spine was reported as normal except for some minimal degenerative changes at C5-6. (*Id.*) Dr. Papaeliou remarked that a sedentary position excluding strenuous labor and any lifting over five pounds was appropriate, and suggested proceeding with an EMG and nerve conduction velocity studies in both upper extremities. (R. 657-58.) Those studies were reported as normal, (R. 660), and Dr. Papaeliou suggested lower extremity EMGs and nerve conduction velocity studies, and requested a formal consultation with Dr. Surrendra Gulati. (R. 661.) Dr. Gulati reported that while Plaintiff had burning sensations in her hands and arms, and pain around the upper back that became worse with activity, she had normal cervical spine movement, her Adson's maneauver was positive bilaterally, and her shoulder movements were normal. (R. 675.) Dr, Gulati did report that there was some cervical myofascial tenderness in the mid-upper thoracic regions, but no definite spinal tenderness was noticed and

there was no lumbar tenderness. (*Id.*) Additionally, there was no myofascial tenderness in the upper extremities, but there was some lateral epicondyle tenderness. (R. 676.) Dr. Gulati indicated that physical therapy would be initiated. (*Id.*)

On February 28, 2006, Plaintiff was referred for an independent medical evaluation, to be completed by Dr. Robert Ayers. (R. 688.) Dr. Ayer's diagnosed Mendoza with pain disorder, possible conversion disorder, depression, tobacco use and iatrogenic deconditioning. (R. 699.) He reported that "[a]n etiology for her current symptoms is not apparant in the provided medical records. The testing performed by her physicians . . . is all within normal limits. There is no sign of a neuropathy." (R. 700.) Dr. Ayers also noted that Mendoza's condition may be better explained as a pain disorder: "The central feature of a pain disorder is that pain is a predominant focus of the presentation and causes significant distress. Psychological factors are judged to play [a] significant role in the onset and maintenance of the pain." (*Id.*)

Mendoza was seen regularly by Dr. Artelia Watson, a pain specialist, from March 22, 2006 until August 4, 2006 for trigger point injections, evaluation and medication management. (R. 710-42.) In her initial evaluation, Dr. Watson reported that Mendoza's range of motion was within functional limits, but that there was right cervical paraspinal muscle tenderness, right cervical facet tenderness, bilateral trapezius muscle tenderness with a palpable trigger point, and mild

thoracic spine tenderness at the T6 level. (R. 710-11.) Dr. Watson suggested trigger point injections, continued physical therapy, and stated that they would consider a psychology evaluation for pain management coping therapies. (R. 711.)

From March 16, 2006 through August 31, 2006, Plaintiff attended physical therapy two times per week. The vast majority of Plaintiff's physical therapy progress evaluations indicate that she "is unable to work," and all of them advised continued physical therapy. (R. 716-42.) The last progress note reports that her condition waxes and wanes; she may feel better for a day or two, but then her condition returns to baseline. (R. 742.) Little or no improvement was noted, and she was again deemed "unable to work." (*Id.*)

Plaintiff was seen by Dr. Jonathan Wang, a neurologist, on August 30, 2006. He reported that there was "electrographic evidence of moderately severe bilateral median neuropathies at the wrists consistent with a diagnosis of carpal tunnel syndrome. . . . [T]he collected data also revealed a left C6/7 nerve root compression." (R.556.)

On November 29, 2006, Plaintiff was referred for another independent medical examination, this time at the request of Auto Owners Insurance Company. (R. 547.) The examination was performed by Dr. Charles Carroll, an orthopedic surgeon (*Id.*) He noted that Plaintiff had myofascial pain syndrome, and that she had bilateral epicondylitis, some mild medial epicondylitis, and some very mild

evidence of carpal tunnel syndrome. (R. 550.) He did not find permanent partial impairment, and determined that she could work with a five-ten pound lifting restriction and that she could not do repetitive activities with either extremity. (R. 551.)

Dr. Edward Navakas is Plaintiff's long-term psychiatrist; the record indicates that she has seen him since April of 2002, (R. 508), and the ALJ indicated that she was seeing him at the time of his decision. (R. 21.) On May 9, 2006, Dr. Navakas noted that Plaintiff was "clearly depressed." (R. 292.) On June 21, 2006, he noted that Plaintiff was "deeply depressed," and that everything is "told through tears"; he also increased her depression medication dosage. (R. 291.) His August 8, 2006 notes indicate that Plaintiff was experiencing "lots of frustration," and that she was "very obsessive." (R. 477.) On October 3, 2006, Dr. Navakas reported that she was "struggling," "edgy, hyperirritable" and yelling a lot; he also noted that she could not sleep. (R. 475.)

From April 11, 2006 until November 15, 2006, Mendoza saw Dr. Erika Lund, a clinial psychologist, for psychotherapy. (R. 594-627.) Dr. Lund's initial evaluation noted that Mendoza appeared stressed and disheveled, that she walked slowly and periodically changed positions in her chair with effort and apparent discomfort, the she felt distressed and hopeless about her condition, and that her living situation appeared chaotic. (R. 627.) Dr. Lund diagnosed Plaintiff with pain disorder associated with both psychological factors and a general medical condition and dysthymia. (*Id.*) Dr. Lund reported that Plaintiff "looked much better and appeared

less stressed than last week" on April 19, 2006, (R. 626), but noted that she "appeared in very bad shape" and that she was crying and in a tremendous amount of pain on April 26, 2006. (R. 625.) On May 24, 2006, Dr. Lund noted that Plaintiff was in tears and in a great deal of pain and "had not had relief for several days. (R. 621.) Dr. Lund also reported that Plaintiff explained that "any amount of exercise exhausts her and increases the pain." (*Id.*) Dr. Lund's July 5, 2006 notes reveal that Plaintiff's affect was depressed and glum, and that she "teared up frequently, especially when talking about her frustration regarding the unpredictability of her intense pain." (R. 615.) On August 2, 2006, Dr. Lund noted that Plaintiff was distressed, and felt "that she is going backwards in terms of her recovery and complained of being always tired, having no energy, and continuing pain each day, especially now with a cramping in her hands and her left foot." (R. 612.)  She also reported that Plaintiff said that "she doesn't like feeling this way because it is simply not her–she wants to be active but she finds that every day now is a great struggle to get everything done." (*Id.*) Dr. Lund's September 20, 2006 notes state that Plaintiff's "affect and coping mechanisms considerably improved from prior sessions, (R. 606), however, the doctor's October 4, 2006 notes state that Plaintiff "presented with flat affect, was low in energy and mildly groggy. Her predominant mood during the session was that of frustration and discouragement." (R. 605.) On November 1, 2006, Dr. Lund reported that Plaintiff was more relaxed, but continued to move tentatively and exhibit low energy; the doctor also noted that Plaintiff explained that "as her pain levels improve, the need to limit her physical

activities every morning has become her greatest struggle." (R. 600.) On the Plaintiff's Work Status Reports of November 1, 2006 and November 15, 2006, Dr. Lund indicated that Plaintiff could not return to work. (R. 652.) On her final visit, Dr. Lund noted that Plaintiff "moved slowly and stiffly" and that Plaintiff reported her pain as intense, and that Plaintiff presented with a flat affect and depressed mood. (R. 599.) Plaintiff cried during most of the session. (*Id.*) In many of Dr. Lund's sessions, Plaintiff talked about the following issues: her home life, relationships with her boyfriend and sons, the stresses of litigation, pain levels, energy levels and exhaustion, sleep patterns, treatment and her other doctors, medications and side effects, physical therapy, and her frustration with not being able to do the things she used to be able to do. (R. 599-627.)

Dr. Lund also completed a mental disorders report on November 2, 2006 on Mendoza's behalf. (R. 594.) In it, she clarified her diagnosis: "Dysthymic Disorder (Depression) – exacerbated by chronic pain and inability to function physically without intensifying pain and fatigue." (*Id.*) Dr. Lund also noted certain situations that trigger Plaintiff's symptoms, and reported that Plaintiff's illness restricts daily activities, and that it impacts on Plaintiff's ability to sustain concentration and attention resulting in frequent failure to perform tasks. (R. 594-95.) Dr. Lund explained that Plaintiff's greatest source of distress is due to the fact that "her physical condition of pain and fatigue does not allow her to function on a daily basis as she did prior to her injuries. This contributes to her feelings of overwhelm, ongoing stress, and homelessness and worry (depression) re: future ability to work

and support her family." (R. 594.) Additionally, Dr. Lund reported that Plaintiff met Listing 12.04. (R. 596.) Specifically, she noted that Plaintiff suffered from Depressive syndrome, manifested by anhedonia, sleep disturbance, decreased energy, difficulty concentrating or thinking, appetite disturbances, and feelings of guilt or worthlessness. She also indicated that Plaintiff had "marked restrictions" in the areas of "activities of daily living," "maintaining social functioning," and "maintaining concentration, persistence or pace." (*Id.*)

Dr. David Rosania saw Mendoza regularly from October 11, 2006 through September 4, 2007 for complaints of pain. (R. 751-793.) Under his care, Plaintiff received epidural injections and trigger point injections. On December 26, 2006, Dr. Rosania found that Mendoza demonstrated multiple taut bands throughout her bilateral upper back with true trigger points with referral pattern to her head, as well as to her left arm. (R. 774.) An examination on January 23, 2007 revealed tenderness at Plaintiff's right lateral epicondyle as well as at her left medial and lateral epicondyle. (R. 771.) On March 27, 2007, he reported multiple tender points in the interscapular region as well as the upper cervical trapezius area. (R. 763.) On April 25, 2007, Dr. Rosania recommended that Plaintiff receive "home support that would help her manage the day to day living activities including parenting and household duties." (R. 762.) Throughout her treatment, he made the following observations: "Overall, her day-to-day living activities remain significantly limited by pain and endurance," (R. 769); "She is currently unable to work secondary to her diagnoses and necessary care" (R. 762); "Ms. Mendoza has a chronic pain syndrome

that is obviously interfering with her ability to do daily living activities." (R. 757.)

Dr. Rosania's treatment plans from November 28, 2006 until June 26, 2007

routinely indicated that Plaintiff was to remain off of work. (R. 756, 757, 758, 764,

769, 772, 775, 779).

On Plaintiff's follow-up visit and evaluation with Dr. Rosania on July 31,

2007, he noted that Plaintiff had returned from a functional capacity evaluation

("FCE") done at ATI Physical Therapy on July 18, 2007.[1] (R. 756.) Dr. Rosania

reported that Plaintiff demonstrated her functional capabilities at a light physical

demand level during the assessment, and that the recommendation from the FCE

was that Plaintiff participate in a work conditioning and work hardening program

for four weeks in order to reach her full functional potential.(*Id.*) Plaintiff

attempted to participate in the work conditioning and hardening program but was

unable to continue because of pain and deconditioning. (R. 751.) Dr. Rosania

reported that outpatient physical therapy was restarted as an alternative to the

work hardening program, but that it had to be terminated as Plaintiff could not

tolerate the regimen because of a flare-up of pain. (*Id.*)

Dr. Rosania requested a consult from Dr. Daniel Cha, an anesthesiologist and

pain specialist. During Dr. Cha's initial evaluation, he determined that Plaintiff

was suffering from myofascial pain secondary to her work-related injury. (R. 859.)

After the initial consultation, Dr. Cha agreed with Dr. Rosania that further trigger

---

[1] Unfortunately, the record does not seem to include Plaintiff's July 18, 2007 FCE.
The Court relies on Dr. Rosania's characterization and description of the FCE.

point injections with steroids and local anesthetics would not likely be of any long-term benefit. (*Id.*) He did believe that Botox trigger point injections could possibly help, and he administered those injections on December 4, 2007. (R. 859-60.) On January 10, 2008, Dr. Cha found that Plaintiff only seemed to have short-term improvement of her symptoms, and he increased her Zanaflex dosage and placed her on Neurontin. (R. 860.) In an April 14, 2008 summary of his care of Plaintiff, Dr. Cha reported,

> [A]lthough her chronic pan may have been caused initially by a work related injury, it seems that her overall recovery has been confounded significantly by psycho-social issues. At this point it does not seem that interventional procedures . . . might help the patient, as her exacerbations of pain symptoms occur more in correlation with her dysthymia and personal stressors, vs. related physical activity and anatomical problems.

(*Id.*) Dr. Cha suggested that Plaintiff's medication be managed, that greater trochanter bursa injections be continued only if she experiences some degree of long-term relief, and for continued psychiatric / psychological counseling. (*Id.*)

### b. Agency Consultant Evaluations and Medical Experts

On July 26, 2006, Dr. Margaret Wharton, a State Agency Mental Health Professional, completed a Psychiatric Review Technique and a Mental Residual Functional Capacity ("RFC") Assessment. (R. 391-404, 413-415.) In the Psychiatric Review Technique, Dr. Wharton determined that Mendoza had a medical history of depression and found that she had a moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate

difficulties in maintaining concentration, persistence, or pace. (R. 401.) She also determined that Plaintiff had one or two episodes of extended duration decompensation. (*Id.*) As such, Dr. Wharton concluded that Plaintiff's condition did not meet or exceed the criteria required for Listing 12.04. (R. 401-02.) In the Mental RFC Assessment, Dr. Wharton determined that Plaintiff was moderately limited in the following areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; and the ability to maintain attention and concentration for extended periods.[2] (R. 413.) Dr. Wharton concluded,

> [Mendoza's c]ognitive and attentional skills are intact and adeqate for simple one-two step work tasks. CT carries out a fair set of ADLS with some limitation secondary to general medical condition. Performs reasonably well on cognitive tasks on MSE. Depressive symptoms associated with medical/physical problems moderately limit ability to carry out detailed tasks.

(R. 415.) She also stated that Plaintiff's interpersonal skills were within normal limits, and that Plaintiff's adaptive skills were within normal limits. (*Id.*)

On July 28, 2006, Dr. B. Rock Oh completed a Physical RFC Assessment. (R. 405-412.) Dr. Oh determined that Plaintiff could occasionally lift up to fifty pounds, frequently lift up to twenty-five pounds, stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday, and push and/or pull with no

---

[2] Dr. Wharton found that Plaintiff was "not significantly limited" in all other areas, including the five abilities listed under the social interaction subheading: the ability to interact appropriately with the general public; the ability to ask simple questions or request assistance; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. 413-414.)

exertional limitations. (R. 406.) As for postural limitations, Dr. Oh reported that Plaintiff could climb, balance, stoop, kneel, crouch and crawl "frequently." (R. 407.) He concluded that Plaintiff had no manipulative limitations, no visual limitations, and no communicative limitations. (R. 408-09.) He also found that Plaintiff was "unlimited" in regard to environmental limitations. (R. 409.)

Plaintiff was also referred to Dr. John Brauer, a clinical psychologist, for a psychological consultative examination on July 10, 2006. (R. 386.) According to his report of disability evaluation, Plaintiff complained primarily of chronic myofascial pain and a consequent limitation in her ability to perform daily activities. (*Id.*) He noted that Plaintiff stated that her "activity level is currently quite limited by pain," and that "she can perform some simple tasks around the home . . . but that the subsequent pain is quite severe, and that she consequently minimizes these incidents by avoiding such exertions." (*Id.*) Dr. Brauer reported that Plaintiff arrived on time for her appointment and was appropriately groomed and attired, that she drove herself there, and demonstrated orientation in regard to her identity, location, time and circumstances. (R. 388.) Plaintiff denied any history of suicidal or homicidal ideation or intent; she also denied any history of auditory, visual or olfactory hallucinations. (*Id.*) Dr. Brauer noted that Plaintiff's general fund of knowledge was grossly intact and that she self-reported that her capacity for attention and concentration were poor, but she performed within normal limits on serial sevens, simple math problems and digit span. (*Id.*) He also found that her capacity for abstraction was grossly intact: she capably interpreted common

proverbs, but she performed poorly in trying to interpret novel proverbs. (*Id.*)

Plaintiff also performed within normal limits on questions regarding similarities

and differences, and the doctor found her judgment to be intact, as evaluated by her

responses to commonly used judgment vignettes. (*Id.*) Dr. Brauer also noted that

Plaintiff "is experiencing major depression." (R. 390.)

### 3.    *Vocational Expert's Testimony*

A vocational expert ("VE") testified at the hearing that Mendoza's most

recent position as a laborer was semi-skilled and done at a medium level of

exertion. (R. 56.) The ALJ asked the VE whether Mendoza could perform this job, or

any of her past jobs, if she were limited to light work with only frequent handling,

fingering and feeling, and limited to simple, repetitive tasks. (R. 57.) The VE

concluded that Plaintiff could not perform any of her past work with the limitations

the ALJ provided in his hypothetical. The ALJ also asked about unskilled, entry

level jobs for such a limited individual. (R. 58.) The VE answered that there were

40,000 office helper positions, 10,000 file clerk positions, and 6,500 mail clerk

positions in the region that would fit within the ALJ's hypothetical. (*Id.*) The VE

also testified that there are 500,000 light, unskilled positions, and 200,000

sedentary, unskilled positions in the region that would accommodate the

hypothetical. (R. 58-59.)

## C.     ALJ Decision

In his findings, the ALJ stated that Mendoza met the disability insured status requirements of the Social Security Act rhough December 31, 2010, and further found that she had not engaged in substantial gainful activity since her disability date. (R. 15.) The ALJ found that she suffered from the severe impairments of carpal tunnel syndrome, myofascial pain disorder with possible cervical radiculopthy, fibromyalgia and depression, but determined that these conditions, alone or in combination, did not meet or medically equal any Listing. (*Id.*) Specifically, the ALJ stated that the credible evidence in the record established that Mendoza could not meet Listing 12.04 because she had only moderate (as opposed to "marked") restrictions in activities of daily living and only moderate difficulties in social functioning and with regard to concentration, persistence or pace. (R. 16.)

The ALJ determined that Mendoza had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except that she was only able to use the upper extremities for handling, fingering and feeling on a frequent basis (as opposed to constantly) and was limited to the performance of simple, repetitive tasks due to her mental impairment. (R. 17.) After reciting some of Mendoza's medical history and testimony, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the

alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functinoal capacity assessment." R. 21.)

The ALJ found that Mendoza's past work required the performance of more than light work, and also required constant handling, fingering or feeling, and/or the performance of more than simple, repetitive tasks; accordingly, he determined that Mendoza was unable to perform her past relevant work. Based on the VE's testimony, however, the ALJ concluded that Mendoza was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (R. 23.) Therefore, he found that Mendoza was not disabled under the Social Security Act. (*Id.*)

## DISCUSSION

### I.    ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed?  (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments

enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.    JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are support by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d. 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v.*

*Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III.  ANALYSIS

In her motion to reverse the Commissioner's final decision, Mendoza alleges a number of errors related to the ALJ's determination, including: (1) the ALJ's credibility determination was flawed; (2) the ALJ failed to include all of Plaintiff's physical and mental limitations in the hypothetical question he posed to the VE; and (3) the ALJ did not properly analyze and consider important medical evidence and opinions.

### A.  Credibility

An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record.  *See Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see also Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quoting *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)) ("'Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.'"). However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88).

When assessing the credibility of an individual's statements about pain or other symptoms and their functional effects, an ALJ must consider all of the evidence in the case record. *See* SSR 96-7p.[3] In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own observations of the individual as part of the overall evaluation of the credibility of the individual's statements. *Id.*

In this case, after very briefly reciting a small portion of Plaintiff's testimony, the ALJ determined that while the "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 21.) Notably, the ALJ did not explain which elements of Plaintiff's testimony, if any, undermined her credibility. He went on to say that

> [T]he claimant's allegations concerning her limitations greatly exceed those that could reasonably be expected form the objective clinical findings. She has not required any surgical interventions and she has not been hospitalized for her any physical complaints. Consequently, I find that her allegations are not credible to the extent that her alleged limitations exceed those described in [the RFC].

---

[3] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

(R. 21.) The ALJ's credibility determination was flawed because his conclusions were, as far as the Court can tell, based almost exclusively on his finding that Claimant's complaints were not consistent with the objective medical evidence in the record. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) ("[A]n ALJ may not discredit testimony of pain solely because there is no objective medical evidence to support it."); *see also Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004) (holding that the ALJ must also consider "(1) the claimant's daily activity; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions"). The ALJ's reference to and reliance on the lack of surgical interventions and hospitalizations as a basis to find that Plaintiff lacks credibility is also insufficient; indeed, not only is such a standard at odds with the aforementioned holding in *Scheck*, but it is arbitrary and medically questionable.

The Court therefore finds that this case must be remanded back to the Commissioner for a full and fair analysis of Plaintiff's credibility, consistent with relevant statutes, regulations, and case law.

## B.     The ALJ's RFC and Hypothetical Question[4]

The RFC is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) (citing 20

---

[4] Plaintiff frames her first argument as a challenge to the ALJ's hypothetical question, but some of her allegations actually concern the ALJ's RFC finding; the Court addresses both issues here.

C.F.R. § 404.1545(a)(1); SSR 96-8p). The ALJ is required "to determine which treating and examining doctors' opinions should receive weight and must explain the reasons for that finding. *Id.* (citing 20 C.F.R. § 404.1527(d), (f)). When determining the RFC, the ALJ "must consider all medically determinable impairments, physical and mental, even those that are not considered 'severe.'" *Id.*

The hypothetical question the ALJ poses to the VE "ordinarily must include *all* limitations supported by medical evidence in the record." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002) (citing *Cass v. Shalala*, 8 F.3d 552, 555-56 (7th Cir. 1993)). The reason for the rule is "to ensure that the vocational expert does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations." *Id.* When the hypothetical question is fundamentally flawed "and does not include all of the limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand." *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004)

In the ALJ's decision, he stated the Plaintiff's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except the claimant is only able to use the upper extremities for handling, fingering and feeling on a frequent basis (as opposed to constantly) and is limited to the performance of simple, repetitive tasks due to her mental impairment.

(R. 17.) During the hearing, the ALJ posed the following hypothetical to the VE: "Assume a hypothetical individual in the age range of 31 to 34, educated at a GED level, the past relevant work the same as the claimant, but limited to light work with only frequent handling, fingering and feeling, and limited to simple, repetitive tasks." (Tr. 57.) Plaintiff argues that the question failed to include limitations regarding social functioning; specifically, Plaintiff asserts that the ALJ found that there were moderate limitations in social functioning but failed to include any such limitations in his hypothetical. In response, the Defendant claims that the ALJ reasonably relied on the state agency mental health professional's assessment, which reflects that even though Plaintiff had moderate difficulties in social functioning, her interpersonal skills were still within normal limits.

Regardless of the source of the ALJ's reliance and the reasoning behind the ALJ's decision to respect the state agency professional's assessment, it remains the case that, in the course of evaluating whether the Plaintiff's depression met or exceeded the level of severity described in Listing 12.04, the ALJ determined that "[i]n social functioning, the claimant has moderate difficulties.[5] (R. 16.) As such, the ALJ's RFC and hypothetical should have reflected this limitation. *See Craft*, 539 F.3d at 675-78. Defendant's argument suggest that since the ALJ also determined that Plaintiff's interpersonal skills were within normal limits, the RFC was

---

[5] The ALJ also determined that the Plaintiff had moderate restriction in daily living activities and moderate difficulties with regard to concentration, persistence or pace. (R. 16.)

adequate; however, Defendant fails to explain why the relative normalcy of Plaintiff's interpersonal skills yields the conclusion that the RFC need not reflect the ALJ's explicit findings of Plaintiff's moderate difficulties. It is unclear whether the area of "interpersonal skills" is equivalent to "social functioning" or whether the area of "interpersonal skills" is only a piece of the "social functioning" pie; neither the record nor the ALJ's decision make this apparent. Whether or not the ALJ's findings are reconcilable, the RFC and the ALJ's hypothetical were flawed. *All* limitations supported by medical evidence in the record must be included in the hypothetical question posed to the VE. *Steele*, 290 F.3d at 942; *Young*, 362 F.3d 995, 1002-05 (7th Cir. 2004), and all such limitations were not so included in the hypothetical in this case. As such, this case must be remanded back to the SSA for further proceedings consistent with this opinion.

It is worth noting that it seems as if the ALJ's apparent inconsistency is likely due to the  independently troubling fact that the State Agency Mental Health Professional's assessment on which the ALJ relies is internally inconsistent on this issue. In the "Rating of Functional Limitations" portion of Plaintiff's "Psychiatric Review Technique," Dr. Wharton reported that Plaintiff's degree of limitation regarding difficulties in maintaining social functioning was "moderate"; (R. 401), however, in Plaintiff's "Mental Residual Functional Capacity Assessment," Dr. Wharton reported (on the same day) that Plaintiff was "not significantly limited" (as opposed to "moderately limited") in all five of the abilities under the "social interaction" heading. (R. 414.) The Court recognizes the limits of its expertise and

knows that there may well be an explanation for what it has interpreted here as likely inconsistent; nevertheless, the ALJ is required to "at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review. *Boiles*, 395 F.3d at 425. There is little clarity here.

### C.  Consideration of Medical Evidence and Opinions

Plaintiff also argues that the ALJ failed to consider important medical evidence and opinions, and that the ALJ erroneously discounted the opinions of some of Plaintiff's treating physicians. Unsurprisingly, Defendant maintains that the ALJ did not ignore important medical evidence, and that he explicitly considered and reasonably discounted the opinions of some of Plaintiff's treating physicians.

A treating doctor's opinion on issues reserved to the Commissioner[6] are never entitled to controlling weight or special significance; however, "opinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p. "If a case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record. *Id*. On issues that are not reserved to the Commissioner, a treating doctor's opinion

---

[6] Issues reserved to the Commissioner include: whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings; what an individual's RFC is; whether an individual's RFC prevents him or her from doing past relevant work; how the vocational factors of age, education, and work experience apply; and whether an individual is "disabled" under the Act. SSR 96-5p.

"receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). "An ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Id.* (quoting *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011)). Even if there are sound reasons for refusing to give a controlling physician's assessment controlling weight, the ALJ is "required to determine what value the assessment did merit." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)).

Here, the ALJ improperly ignored and/or discounted the medical opinions of some of Plaintiff's treating physicians. First, the ALJ fails to mention Dr. Rosania, Plaintiff's primary pain doctor before Dr. Cha. Admittedly, Dr. Rosania's opinions are somewhat limited, but he does make some important conclusions: "Overall, her day-to-day living activities remain significantly limited by pain and endurance," (R. 769); "She is currently unable to work secondary to her diagnoses and necessary care" (R. 762); "Ms. Mendoza has a chronic pain syndrome that is obviously interfering with her ability to do daily living activities." (R. 757.)   Additionally, Dr. Rosania's treatment plans from November 28, 2006 until June 26, 2007 routinely indicated that Plaintiff was to remain off of work, (R. 756, 757, 758, 764, 769, 772, 775, 779), and some of his evaluations do reveal relevant physical findings. (R. 763,

771, 774.) Dr. Rosania's evaluations also include many of the Plaintiff's own reports and statements, as well as indications of what treatment options were successful and unsuccessful, many of which tend to support Plaintiff's credibility.

Defendant argues that Dr. Rosania's April 24, 2007 opinion that plaintiff was currently unable to work was an opinion on an issue expressly reserved to the Commissioner and was therefore not entitled to any special significance. Perhaps, but Dr. Rosania's opinion could not be ignored by the ALJ. SSR 96-5p. The ALJ was required to evaluate all the evidence in the case record to determine the extent to which Dr. Rosania's opinions were supported by the record. The ALJ failed to do this.

Second, the ALJ improperly discounted the opinions of Drs. Lund, and Navakas, both of whom were treating physicians in this case. As to Dr. Lund, the ALJ stated that "the period of treatment by that psychologist was relatively short, claimant does not continue to see her and it appears many of her problems were situational with her boyfriend." (R. 21.) The ALJ also noted that there was no significant narrative that accompanied the form Dr. Lund completed at Plaintiff's request, and that "most of the limitations described in the form are actually attributable to the claimaint's alleged physical discomfort rather than mental disorders." (*Id.*)

The ALJ's analysis is questionable for a variety of reasons. The "relatively short" period of treatment was seven months in duration, and the record indicates that Plaintiff met with Dr. Lund on at least sixteen separate occasions. (R. 599-627.) The ALJ did not explain why a seven-month treatment period was insufficient. Next, that many of Plaintiff's problems, as viewed through Dr. Lund's progress notes, dealt with "parenting and relationship issues and the stresses involved with litigation" seems irrelevant to the issue of the value of Dr. Lund's opinions; also, that particular claim grossly mischaracterizes and underanalyzes many of Plaintiff's sessions with Dr. Lund. (*Id.*) As far as the ALJ's claim that Dr. Lund's form ("Mental Disorders Report," R. 594-96) lacks significant narration, the ALJ does not explain how this is different from the State Agency's reports that consist mostly of checkmarks. (*See, e.g.*, R. 391-416.) Furthermore, the checkmarks Dr. Lund made *were* accompanied by significant narration, including, but not limited to the following: "Diagnosis: Dysthymic disorder (Depression) – exacerbated by chronic pain and inability to function physically without intensifying pain and fatigue," (R. 594); "Patient's greatest source of distress is due to the fact that her physical condition (of pain and fatigue) does now allow her to function on a daily basis as she did prior to her injuries. This contributes to her feelings of overwhelm, ongoing stress, and hopelessness and worry (depression) re: future ability to work and support her family." (*Id.*) Finally, the ALJ's claim that most of the limitations described in the form are attributable to alleged physical discomfort (and not

mental disorder) is not supported by the record; more fundamentally, however, it misunderstands the complex interplay between physical pain and depression that several of Plaintiff's treating physicians observed, and that, for the most part, the ALJ ignored.

In his assessment of Dr. Lund's treatment, the ALJ did little to suggest that Dr. Lund's opinions were not well-supported, or that they were  inconsistent with the other substantial evidence in the record. He did explain that he found the discussion provided by the State Agency to be more persuasive "because of its detail in reference to the record," (R. 22), but that kind of broad and unexplained reasoning does not amount to the "good reasons" an ALJ must offer for discounting a treating physician's opinion. *See Scott*, 647 F.3d at 739. And even if the ALJ did provide sound reasons to prefer the State Agency's opinions in this case, the ALJ was required to determine what value Dr. Lund's opinion did merit. *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ failed to make such a determination.

The ALJ's treatment of Dr. Navakas's opinions is similarly problematic. Regarding Dr. Navakas, the ALJ stated only this: "The claimant has been followed by a psychiatrist E.H. Navakas, M.D., since 2001 . . . . The record contains some of his hand-written records that contain very little in the way of actual clinical findings and do not indicate a diagnosis or an assessment of severity." (R. 19.) As Plaintiff points out, however, Navakas's notes state, among other things, that Plaintiff was "clearly depressed," (R. 292), "deeply depressed," (R. 291), that

everything is "told through tears," (*Id.*), and that Plaintiff was "edgy, hyperirritable." (R. 475.) Navakas's notes support many of Dr. Lund's observations and opinions; and like Dr. Rosania's evaluations, Navakas's notes include many of the Plaintiff's own reports and statements, many of which would have been relevant to the ALJ's credibility determination. At the very least, the ALJ should have explained the clinical findings that did exist instead of dismissing them because the records contained "very little" of them.

The ALJ failed to consider relevant medical evidence and opinions, and erroneously discounted the opinions of some of Plaintiff's treating physicians; therefore, the Court concludes that the matter must be remanded to the Commissioner for a thorough consideration of all of the medical evidence in the record and a detailed explanation of why certain evidence was given greater or lesser weight. The Court expresses no opinion about the decision to be made on remand but encourages the Commissioner to use all necessary efforts to build a logical bridge between the evidence in the record and his ultimate conclusions, whatever those conclusions may be. *See, e.g., Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("On remand, the ALJ should consider all of the evidence in the record, and, if necessary, give the parties the opportunity to expand the record so that he may build a 'logical bridge' between the evidence and his conclusions."); *see Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000)*; Luna v. Shalala,* 22 F.3d 687, 693 (7th Cir.

1994). The Court further emphasizes that this opinion is limited to three major errors justifying remand. The Commissioner should not assume that any other claimed errors not discussed in this order have been adjudicated in his favor. On remand, the Commissioner therefore must carefully articulate his findings as to every step.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [Doc. No. 19] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this opinion.

SO ORDERED.                    ENTERED:

DATE:  **November 14, 2011**              _____
                                        **HON. MARIA VALDEZ**
                                        **United States Magistrate Judge**